United States Court of Appeals,

Eleventh Circuit.

No. 95-8151.

Blane CESNIK, Kristi Cesnik, Plaintiffs-Appellants.

v.

EDGEWOOD BAPTIST CHURCH, d/b/a New Beginnings Adoption and Counseling Agency, et al., Defendants-Appellees.

July 5, 1996.

Appeal from the United States District Court for the Middle District of Georgia. (No. 93-CV-141-COL), J. Robert Elliott, Judge.

Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and FAY, Senior Circuit Judge.

TJOFLAT, Chief Judge:

This case arises out of the adoptions of two newborn babies. The adopting parents contend that the adoption agency deliberately misrepresented that the infants were healthy when, in fact, they were severely mentally and physically disabled. The adopting parents brought this suit against the church that operates the adoption agency and against three individuals involved directly or indirectly in the adoptions. The parents' complaint presented multiple common-law and statutory (both state and federal) tort claims and a claim for breach of contract. On motion for summary judgment, the district court dismissed all of the parents' claims. This appeal followed.

With respect to the common-law tort claims, we are able to say with confidence that the district court was correct in relying on the statute of limitations to bar the claims. With respect to the remainder of the appellants' claims, however, all that we can say is that, with a few exceptions, the district court's granting of

summary judgment cannot be sustained on this record.  Our review of these claims is limited because the appellants have presented us with a "shotgun" complaint, which is so muddled that it is difficult to discern what the appellants are alleging beyond the mere names of certain causes of action.

We begin this opinion with a statement of the facts, which we glean from the depositions and affidavits that the parties presented to the district court in support of and in opposition to the appellees' joint motion for summary judgment.  In drawing this statement of facts, we consider the evidence in the record in the light most favorable to the non-movants, the appellants.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).  After setting out the facts, we examine the appellants' complaint, and the district court's reasons for disposing of appellants' claims.  We then explain why summary judgment was appropriate on some of appellants' claims and why some of their claims should not have been disposed of summarily.

I.

Blane and Kristi Cesnik, who live in St. Cloud, Minnesota, are the parents of four severely mentally and physically disabled children, all of whom they have adopted.  They adopted their two youngest children, Caleb and Eli, through the New Beginnings Adoption and Counseling Agency, an unincorporated entity operated by the Edgewood Baptist Church, a corporation organized under Georgia law with its place of business in Columbus.[1]

---

[1]The Cesniks adopted two disabled girls prior to the adoptions that are the subject of this lawsuit.  New Beginnings was not involved with those prior adoptions.

In November of 1989, Kristi Cesnik called Phoebe Dawson, the director of New Beginnings, and told Dawson that she and her husband were seeking to adopt a healthy, non-disabled child of any sex and any race. On November 20, 1989, a baby boy, whom the Cesniks would name Caleb, was born at a hospital in Columbus. Dawson contacted the Cesniks by telephone and told them that she had obtained and reviewed the medical records of Caleb's delivery, including the results of tests that the Cesniks had asked to be performed. Dawson told them that all of the medical records and other information she had obtained indicated that the boy was perfectly healthy. Dawson also told the Cesniks that Caleb's birth mother had received prenatal care since the sixth week of pregnancy and that she had not used drugs during the pregnancy.

Dawson delivered Caleb to the Cesniks on December 10, 1989, at an airport in Minnesota. The Cesniks soon noticed that Caleb had health problems. Four to six months after the placement, the Cesniks received Caleb's medical records.[2] The records showed that the birth mother had, in fact, received no prenatal care, that she had tested positive for opiates and barbiturates at the time of delivery, that the delivery had been complicated, and that Caleb had been born prematurely. The Cesniks' doctors soon diagnosed Caleb with cerebral palsy, asthma, developmental disorders, and severe behavioral problems. The doctors suspect that most or all of these conditions were caused by exposure to drugs and alcohol

_____

[2]At the time of Caleb's placement, the Cesniks signed a form that stated that they had received Caleb's medical records. This statement was not true. Dawson had told the Cesniks that signing the form at that time would make it unnecessary for her to make another trip to Minnesota.

during the pregnancy and by a lack of prenatal care.

When the Cesniks asked Dawson about the discrepancy between the medical records and what she had told them, Dawson explained that she had not actually reviewed Caleb's medical records before he was placed with the Cesniks because the records had been switched at the New Beginnings agency with those of another mother with the same name.  Dawson also claimed that Caleb's birth mother had lied about her condition and her use of drugs.  The Cesniks accepted Dawson's explanations.  The adoption of Caleb became final on July 10, 1990.

In December of 1990, the Cesniks contacted New Beginnings again, seeking to adopt a healthy, non-disabled, black or mixed-race child.[3]  On February 12, 1991, a baby boy, whom the Cesniks would name Eli, was born at a hospital in Columbus.  Dawson contacted the Cesniks by telephone and told them that she had obtained and reviewed the medical records of Eli's delivery, including the results of tests that the Cesniks had asked to be performed.  Dawson told them that all of the medical records and other information she had obtained indicated that the boy was perfectly healthy.  Dawson also told the Cesniks that Eli's birth mother had received prenatal care since the early stages of her pregnancy, and that Dawson knew the birth mother's personal history, including the fact that the birth mother had not used drugs during the pregnancy.

Dawson delivered Eli to the Cesniks on April 6, 1991, at an

_____

[3]The Cesniks sought a black or mixed-race child in the interest of Caleb, who is black.

airport in Minnesota.  The Cesniks soon noticed that Eli had health problems, and they contacted Dawson by telephone and requested his medical records.[4]  The agency sent the medical records a week or two later.  The records showed that Eli's birth mother had, in fact, received no prenatal care and that she had experienced severe preeclampsia and toxemia.  Furthermore, no drug test had been performed on Eli at the time of birth, as had been requested by the Cesniks.  A drug test performed on April 1 indicated the presence of codeine and morphine, although that may have been the result of medication that Eli was taking at the time.  The records also showed that Eli had intrauterine growth retardation and low Apgar scores.  The Cesniks' doctors soon diagnosed Eli with cerebral palsy, pseudobulbar palsy, asthma, stomach problems, fetal alcohol syndrome, facial deformities, colitis, a sleeping disorder, and behavior problems associated with autism.  The doctors suspect, as they do with Caleb, that most or all of these conditions were caused by exposure to drugs and alcohol during the pregnancy and by a lack of prenatal care.

When the Cesniks asked Dawson about the discrepancy between the medical records and what she had told them, Dawson explained, as she did after Caleb's placement, that she had not actually reviewed Eli's medical records before he was placed with the Cesniks because the records had been switched at the New Beginnings agency with those of another mother with a similar name.  Dawson also claimed that Eli's birth mother had lied about her condition

_____

[4]Just as they did at the time of Caleb's placement, the Cesniks signed a form that stated that they had received Eli's medical records.  Again, this statement was not true.

and her use of drugs.  This time, the Cesniks did not accept Dawson's explanations.

On July 21, 1991, shortly after the Cesniks began making inquiries about receiving an adoption assistance subsidy from the state of Georgia for the two boys,[5] Dawson met the Cesniks at their home in Minnesota.  Holding Eli in her arms, Dawson told the Cesniks that she could withhold her consent to the Cesniks' adoption of the boy if there was any further discussion of his medical condition or if the Cesniks did not keep quiet about what had happened.  After this incident, the Cesniks had no further contact with Dawson.  The adoption of Eli became final on September 26, 1991.

In August of 1992, the Cesniks made a formal complaint to the Georgia Department of Human Resources about the manner in which New Beginnings handled the placements of Caleb and Eli.  The state agency investigated, found various deficiencies in New Beginnings' adoption procedures, and required the agency to take corrective action.

## II.

On December 9, 1993, the Cesniks filed a complaint in the United States District Court for the Middle District of Georgia against the Edgewood Baptist Church, Andy Merritt (the associate pastor of Edgewood Baptist Church who had supervisory authority over New Beginnings), Phoebe Dawson (the executive director of New

---

[5]The Georgia Department of Human Resources provides federally subsidized adoption assistance payments for children with "special needs," including mental and physical disabilities. *See* Social Security Act of 1935, 42 U.S.C. § 673 (1994).

Beginnings), and Mary Ellen Slaughter Winton (the social case worker hired by New Beginnings to work with Eli's birth mother during her pregnancy). The complaint consists of three counts, which are preceded by ninety-nine numbered paragraphs of factual recitations that are incorporated by reference into each of the three counts. In addition, count two incorporates all of the allegations—including the causes of action—of count one, and count three, in turn, incorporates all of the allegations—including the causes of action—of counts one and two.

The complaint is the sort of "shotgun" notice pleading we encountered in *Anderson v. District Bd. of Trustees,* 77 F.3d 364, 366-67 (11th Cir.1996), and in scores of other cases—both reported and unreported—that have come before this court.[6] It was framed in complete disregard of the principle that separate, discrete causes of action should be plead in separate counts. *Anderson,* 77 F.3d at 366. Count one, for example, which is labeled "Wrongful Placement and Adoption," purports to plead at least nine discrete theories of recovery. After alleging that the Cesniks were induced by the appellees' misrepresentations to adopt Caleb and Eli, the count states the following:

> This count of the Complaint encompassed by the claim of "Wrongful Placement and Adoption" and sounding in tort law, includes but is not limited to the common law torts of negligent breach of duty; negligent hiring, training, supervision, discipline and retention of personnel;

[6]*See, e.g., Fikes v. City of Daphne,* 79 F.3d 1079, 1082-83 (11th Cir.1996); *Beckwith v. City of Daytona Beach Shores,* 58 F.3d 1554, 1567 (11th Cir.1995); *Pelletier v. Zweifel,* 921 F.2d 1465, 1517-18 (11th Cir.), *cert. denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991); *T.D.S. Inc. v. Shelby Mut. Ins. Co.,* 760 F.2d 1520, 1543-44 n. 14 (11th Cir.1985) (Tjoflat, J., dissenting).

negligence per se; breach of fiduciary relationship; misrepresentation; fraud in the inducement and the act; undue influence; duress; and intentional infliction of emotional distress.

Nowhere in count one do the Cesniks set forth any of the elements of these separate causes of action or the facts underpinning them. Rather, a reader of the pleading must discern these things for himself.

Count two is labeled "Breach of Contract." The count alleges that in 1989 and again in 1991 the Cesniks and New Beginnings entered into a contract for the placement of a healthy baby. Count two does not, however, indicate whether the contract was reduced to writing, nor does it recite the provision(s) of the contract that New Beginnings breached.[7] All that is alleged is that "the defendants breached their contractual agreement with the plaintiffs for the placement and adoption of the plaintiffs' sons Caleb and Eli."

Count two also presents a claim for fraud with the following allegation: "The defendants fraudulently took monies for the placement of the plaintiffs' sons Caleb and Eli which were not earned, were for services not provided, were for expenses not incurred, and/or were not paid to the parties for whom the Cesniks were billed." In addition, of course, by incorporating all of the allegations of count one, count two alleges all of the other tort claims alleged in count one.

Count three is labeled "Federal and State Conspiracy." As we

---

[7]Count two seeks to hold the individual defendants, as well as the church, liable for breaching a contract as to which the individual defendants are not parties.

explain below, count three may be alleging five discrete causes of action:  three federal claims and two state claims.  Count three alleges the following (with respect to both the Cesniks' federal and state claims):

> All defendants ... came to a mutual understanding to try to accomplish a common and unlawful plan, namely to engage in a "pattern of racketeering activity."

> .   .   .   .   .

> At the time the defendants knowingly and willingly agreed to join such a conspiracy, they did so with the specific intent to participate in at least two (2) of the predicate mail fraud and wire fraud offenses.

> Defendants knowingly and wilfully used the mails for communication and telephones for conversations in Interstate Commerce or caused to be transmitted by mail or wire in Interstate Commerce communications for the purpose of executing their scheme to defraud.  18 U.S.C. § 1341 and 1343.

> Said conspiracy is actionable under 18 U.S.C. § 1962 *et seq.* and O.C.G.A. § 16-4-1 *et seq.*

Under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (1994) (as added by the Organized Crime Control Act of 1970, Pub.L. No. 91-452, § 901(a), 84 Stat. 922, 941-48), it is illegal for persons to

> engage in, or aid and abet another to engage in, a pattern of racketeering activity if they also do the following:  invest income derived from the pattern of racketeering activity in the operation of an enterprise engaged in interstate commerce (section 1962(a));  acquire or maintain, through the pattern of racketeering activity, any interest in or control over such an enterprise (section 1962(b));  or conduct, or participate in the conduct of, the affairs of such an enterprise through a pattern of racketeering activity (section 1962(c)).  Section 1962(d) makes it a crime to conspire to violate sections 1962(a), (b), or (c).

*Pelletier v. Zweifel,* 921 F.2d 1465, 1495-96 (11th Cir.), *cert.*

*denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991).[8] RICO provides a civil remedy for the victims of these section 1962 crimes, as follows:  "Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).[9]

Count three alleges that the defendants were engaged in a "conspiracy," presumably in violation of 18 U.S.C. § 1962(d).  To state a claim for damages suffered by reason of a violation of section 1962(d), a plaintiff must allege that the defendants conspired to violate one of the substantive provisions of 18 U.S.C. § 1962(a)-(c).  The complaint nowhere indicates, however, which crime the defendants allegedly conspired to commit.  We are left to speculate whether the Cesniks seek to state a claim for damages by reason of a conspiracy to violate section 1962(a) or (b) or (c).[10] Finally, to state a RICO claim a plaintiff must describe the

---

[8]An act of "racketeering," commonly called a predicate act, is defined to include "any act which is indictable under ... [18 U.S.C. §] 1341 (relating to mail fraud), [and 18 U.S.C. §] 1343 (relating to wire fraud)."  18 U.S.C. § 1961(1)(B).  The elements of mail and wire fraud are identical.  "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme."  *Pelletier,* 921 F.2d at 1498.

[9]Count three makes no reference to 18 U.S.C. § 1964(c).  We treat the Cesniks' allegation that the conspiracy is "actionable under 18 U.S.C. § 1962 *et seq.*" as stating a claim for relief under section 1964(c).

[10]In their brief to the district court in opposition to the appellees' joint motion for summary judgement, the Cesniks did not inform the court which sections the appellees allegedly conspired to violate.

"enterprise" involved in the defendant's scheme, for without an enterprise there can be no RICO violation. *See* 18 U.S.C. § 1962(a)-(c). The word "enterprise" appears nowhere in the complaint.[11]

Count three also possibly asserts two claims for relief under the Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act, O.C.G.A. §§ 16-14-1 to 16-14-15 (1992 & Supp.1995). Those claims are described in the margin;[12] they suffer the same infirmities as their federal counterparts.

Despite the fact that the Cesniks' complaint, especially count

---

[11]Nor does the word "enterprise" appear in the Cesniks' brief in opposition to the appellees' joint motion for summary judgment. In the section of the Cesniks' appellate brief concerning federal RICO, the word "enterprise" appears only in a quotation from section 1962.

[12]There are two substantive criminal provisions in the Georgia RICO statute:

> (a) It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.
>
> (b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

O.C.G.A. § 16-14-4. Like 18 U.S.C. § 1962(d), O.C.G.A. § 16-14-4(c) makes it illegal "to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of [O.C.G.A. § 16-14-4]."

> O.C.G.A. § 16-14-6(c) provides a victim of these crimes a civil remedy in much the same fashion as does 18 U.S.C. § 1964(c). We treat the allegation in the Cesniks' complaint that the alleged conspiracy is "actionable under ... O.C.G.A. § 16-14-1 *et seq.*" as stating a claim for relief under section 16-14-6(c).

three, is so disorganized, the appellees did not move the district court to require the Cesniks to file a more definite statement. *See* Fed.R.Civ.Proc. 12(e). Nor did the court require one. [13] Instead, the appellees opted to file an answer. They admitted that the adoptions took place, but denied liability under any of the appellants' theories of recovery. The appellees also plead several affirmative defenses, including that the complaint failed to state a claim for relief and that the statute of limitations barred the Cesniks' claims.

Following extensive discovery, the district court granted the appellees' motion for summary judgment as to all of the Cesniks' claims for relief. The court read the Cesniks' complaint as having presented several tort claims, a claim for breach of contract, and claims "under the federal and state conspiracy statutes." The court referred to the Cesniks' common-law tort claims as claims for "personal injury, mental and physical," claims under the "remaining theories under the tort of wrongful adoption and placement,"[14] and a "claim for fraud."

The district court concluded that the Cesniks' common-law tort claims were barred by the applicable two-year statute of limitations. It concluded that the Cesniks' contract claim was

---

[13]The court clearly had the discretion to strike, on its own initiative, the Cesniks' complaint, and to require the Cesniks to file a more definite statement. *See Anderson,* 77 F.3d at 367 n. 5.

[14]In referring to the "remaining theories under the tort of wrongful adoption and placement," we assume that the court was referring to some or all of the tort theories described in count one (labeled "wrongful placement and adoption" by the appellants), which we quote in the text *supra.*

foreclosed because they "could have avoided" the injury they allegedly sustained

> by the use of reasonable effort after they learned of the mental and physical conditions of the children because under the terms of the placement agreement the Plaintiffs could simply have ended the adoption proceedings and could have returned the children to the Agency.

Finally, the court found no merit in the Cesniks' federal and state RICO claims because the record contained no evidence of a conspiracy to defraud the Cesniks or the predicate acts of mail or wire fraud. The court said nothing regarding the Cesniks' failure to describe the enterprise allegedly involved in the appellees' conspiracy; nor did it indicate which substantive provision of 18 U.S.C. § 1962 the appellees were supposed to have conspired to violate. In short, the court did not consider whether count three of the complaint stated a claim for relief.

### III.

We are satisfied that the statute of limitations bars whatever tort claims the Cesniks may have had under Georgia common law. Accordingly, we affirm the district court's summary disposition of those claims. As for the Cesniks' remaining claims—the claim for breach of contract and the claims under the federal and Georgia RICO statutes—with a few exceptions, we are unable, on the state of the record before us, to sustain the court's judgment. We first consider the common-law tort claims.

### A.

Although the district court did not identify all of the Cesniks' common-law tort claims—it referred to many of them as the "remaining theories under the tort of wrongful adoption and

placement,"[15]—it concluded that all of them were barred by the two-year statute of limitations because all of the alleged tortious acts occurred (at the latest) prior to September 26, 1991 (the date of Eli's adoption), and the suit was not filed until December 12, 1993. *See* O.C.G.A. §§ 9-3-33, 9-3-96 (1982).[16] The Cesniks argue, however, that the running of the period of limitations was tolled when Phoebe Dawson made her threat at the Cesniks' home on July 21, 1991. The Cesniks claim that after that date they were unable to take any sort of legal action against the appellees out of fear that the agency might take reprisals—either by withholding the agency's consent to the adoption of Eli,[17] or by making it difficult for the Cesniks to receive an adoption subsidy from the state of Georgia. This fear supposedly persisted from the time of the threat until May 18, 1993, when the Georgia Department of Human Resources notified the Cesniks that they would receive an adoption subsidy. The Cesniks argue that the running of the period of limitations was tolled during the twenty-seven months that they were under the duress caused by Dawson's threat, and that therefore

---

[15]Neither the Cesniks nor the district court cited any authority for the proposition that Georgia recognizes a tort of "wrongful adoption and placement," and we have found none.

[16]O.C.G.A. § 9-3-96 provides that "[i]f the defendant ... [is] guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." The Cesniks did not discover the fraud associated with the placements of Caleb and Eli until the boys' medical records were sent to them by mail. Thus, in the case of Caleb, the period of limitations began running in May of 1990; in the case of Eli, in April of 1991.

[17]Caleb's adoption had been final for a year before July 21, 1991, the day that Dawson made her threat. Eli's adoption, however, was not final until September 26, 1991.

their claim was filed within the limitations period.[18]   We do not agree.

The record shows that shortly after the Cesniks began making efforts to get a state adoption subsidy, Phoebe Dawson flew to Minnesota and met the Cesniks in their home.  Dawson asked to hold Eli, and, once the child was in her arms, she is alleged to have stated something to this effect:  "This child is in my custody.  I can withhold [our] consent to adopt if there is any more discussion of [Eli] being handicapped or drug exposed [or if you do] not keep quiet about what ha[s] happened."  Dawson then handed Eli back and left the home.  Dawson and the Cesniks had no further contact.

The Cesniks claim that this threat put them in fear of losing Eli if they took any action against the agency.  But this fear could have been reasonable only until August 8, 1991 (eighteen days after the threat), when New Beginnings gave its consent to Eli's adoption.  The Cesniks claim that after Eli's adoption they feared that the agency might block their attempts to receive an adoption subsidy for both Caleb and Eli from the state of Georgia.  But Dawson made no such threat, and it is not clear that Dawson or New Beginnings had any influence in this matter whatsoever.  Moreover, the fear of retaliation by New Beginnings was evidently not so great as to keep the Cesniks from filing an administrative

---

[18]The Cesniks claim that the statute ran for 21 months in the case of Caleb (from May of 1990, when the fraud was discovered, to July 21, 1991, when Dawson made her threat, and again from May of 1993, when the adoption subsidy was approved, to December 9, 1993, when the claim was filed in district court), and for 91/2 months in the case of Eli (from April of 1991, when the fraud was discovered, to July 21, 1991, and again, as with Caleb, from May of 1993, to December 9, 1993).  The period of limitations is 24 months.

complaint against the adoption agency in August of 1992.[19]  In sum, we find that there was no reasonable basis for a claim of duress after August 8, 1991, which was more than two years prior to the filing of the lawsuit.[20]  The district court was thus correct in deciding that the statute of limitations barred the appellants' common-law tort claims.

B.

The district court rejected the Cesniks' contract claim on the ground that they could have mitigated their damages in full by returning the children to New Beginnings, as provided in the placement agreement.  The problem with this holding is that neither the complaint nor the court describes the placement agreement.  We

---

[19]The Cesniks also offer no explanation for why they waited another seven months after the approval of the adoption subsidy to sue the agency.

[20]We do not mean to suggest that a reasonable claim of duress would necessarily have tolled the running of the statute of limitations in this case.  Duress is not one of the enumerated conditions that tolls the statute of limitations under Georgia law.  *See* O.C.G.A. §§ 9-3-90 to 9-3-97.1 (1982 & Supp.1995). Moreover, we find no authority for the proposition that duress, as a matter of Georgia common law or equity, can toll the statute of limitations for a cause of action that is not itself based on a claim of duress.  Indeed, what little authority we have found on the subject suggests that such a proposition could be maintained in very few states.  *See Cooper v. Fidelity-Phila. Trust Co.,* 201 F.Supp. 168, 170 (E.D.Pa.1962) ("There is little authority for the proposition that "duress' tolls the running of the statute of limitation.");  *Baratta v. Kozlowski,* 94 A.D.2d 454, 464 N.Y.S.2d 803, 807 (1983) ("[R]eluctance [of courts] to recognize duress as a toll [may lie] in the undesirability of a rule that turns on the reasonableness of reliance upon threats of physical or economic harm, the ease of fabrication of such threats, or simply in the judicial reluctance to create an entirely new defense to the [s]tatute of [l]imitations.") (citations omitted);  *see also* Annotation, *Duress or Undue Influence as Tolling or Suspending Statute of Limitations,* 121 A.L.R. 1294 (1939);  51 Am.Jur.2d. *Limitation of Actions* § 177 (1970);  54 C.J.S. *Limitations of Actions* § 92 (1987).

will assume for sake of argument, however, that New Beginnings breached the placement agreement when it misrepresented the condition of the boys' health. We further assume that upon the agency's breach the Cesniks could have cancelled the agreement with New Beginnings and returned the children to the agency. The question then becomes whether the Cesniks were required to do so, or else suffer the consequences.

The situation is analogous to a seller misrepresenting the quality of goods being sold to a buyer. Ordinarily, a buyer of goods that are not of the quality represented has two options. He can rescind the transaction by returning the goods to the seller and demanding a return of the purchase price, or he can stand on the transaction and sue for damages—measured by the difference in value between the goods as represented and the goods as received. Here, the Cesniks kept the children and seek to recover the expenses they will incur in excess of those they would have incurred had the children not been disabled.

The district court held, in effect, that the Cesniks did not have the option of standing on the contract and suing for damages. Rather, according to the court, the Cesniks had but one remedy: rescission. The court cited no authority for its holding and the appellees have likewise cited none; nor can we find any.[21] Under

---

[21]The appellees have cited statutes and cases that stand for the proposition that, under the law of Georgia, a claimant has a duty to mitigate his damages. This proposition, which is well founded in the common law, speaks to the issue of damages; it does not address the question whether the claimant can state a cause of action for breach of contract. Assuming that, on remand, the Cesniks can state a claim for breach of contract, the extent to which they may have failed to mitigate their damages will be a question to be resolved in litigating the issue of

the circumstances, we cannot sustain the court's summary rejection of the Cesniks' claim for breach of contract against the Edgewood Baptist Church. Because there is nothing in the record, however, that indicates that appellees Dawson, Merritt, and Winton were parties to the Cesniks' contract with the church, we affirm the district court's disposition of the breach of contract claim brought against them individually.

C.

As we have pointed out, the pleading of the Cesniks' federal and state RICO claims, in count three of their complaint, is woefully deficient. Count three does not cite the crimes (under 18 U.S.C. § 1962 and O.C.G.A. § 16-14-4) that the defendants allegedly conspired to commit. Nor does the pleading describe the "enterprise" involved in the conspiracy.[22] If ever there was a need for a more definite statement, it was with respect to count three.

The district court did not reject these claims because they were inadequately plead, however. Rather, the court concluded that the Cesniks could not make out a federal or state RICO claim because they had presented no evidence of (1) a conspiracy or (2) predicate acts of mail or wire fraud. We are convinced that, with the exception of appellee Winton, the court erred on these two

damages.

[22]The appellees did not base their joint motion for summary judgment on this deficiency, however, and the district court did not cite it as a ground for granting summary judgment. We therefore do not consider whether we should exercise our authority to affirm a district court's judgment dismissing a case on a ground not relied upon by the district court—in this instance, on the ground that the appellants failed to articulate an indispensable element of a federal or state RICO claim.

points.

With respect to the first point, a reasonable jury could find from the evidence in the record that defendant Dawson misrepresented the boys' health for the purpose of inducing the Cesniks to accept them for adoption, that appellee Merritt participated in or was aware of the scheme,[23] and that their conduct implicated the church.[24] As for the second point, the facts we have recited, in part II *supra,* establish (for purposes of summary judgment) a scheme to defraud and several uses of the mails and wires in furtherance of that scheme.[25]

IV.

In conclusion, we affirm the district court's judgment dismissing count one of the appellants' complaint. As to count two, we affirm the court's judgment in favor of appellees Dawson, Merritt, and Winton, but vacate its judgment in favor of the church and remand for further proceedings. With respect to count three,

---

[23]In contrast, the appellants have pointed to no evidence in the record, and we find none, sufficient to permit a reasonable jury to find that appellee Winton either participated in or was aware of the alleged conspiracy among Dawson, Merritt, and the church to defraud the Cesniks. (Winton did not become a employee of New Beginnings until after Caleb's placement; she is alleged to have participated in Dawson's scheme only with respect to Eli.) We thus affirm the district court's granting of summary judgment in favor of Winton.

[24]We express no view as to whether, under 18 U.S.C. § 1962(d), a corporation can be held to have conspired with one of its employees.

[25]The statute of limitations for a RICO claim is four years under the federal statute, *see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987), and five years under Georgia RICO, *see* O.C.G.A. § 16-14-8. The record discloses uses of the mail and the telephone within four years of the filing of this law suit.

we affirm the court's judgment in favor of appellee Winton, but vacate its judgment in favor of the remaining appellees. As to these appellees, count three is remanded for further proceedings.

Because the allegations of counts two and three are so muddled, we instruct the district court, before proceeding further in this case, to require the appellants to replead counts two and three of their complaint. With respect to count two, the appellants shall allege only a breach of contract—assuming that they wish to pursue such a claim. If the contract on which their claim is based is in writing, the appellants shall either attach the writing to the complaint, or recite the provision(s) of the contract that they contend give rise to their action for breach.

In repleading count three, the appellants shall state only one claim for relief. If they wish to state a claim under the federal RICO statute, they shall indicate the statutory provision(s) giving rise to such claim and shall also describe the enterprise involved in the RICO violation. If the appellants wish to state a claim under the Georgia RICO statute, they shall do so in a new count.

More need not be said.

SO ORDERED.