[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10658

_____

IN RE: TUPPERWARE BRANDS CORPORATION SECURITIES
LITIGATION

SRIKALAHASTI M. VAGVALA,

Individually and on behalf of all other persons
similarly situated,

Plaintiff-Appellant,

*versus*

TUPPERWARE BRANDS CORPORATION,
PATRICIA A. STITZEL,
CASSANDRA HARRIS,
MICHAEL POTESHMAN,
E.V. "RICK" GOINGS,

LUCIANO GARCIA RANGEL,

Defendants-Appellees,

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-00357-GAP-GJK

_____

Before BRANCH and GRANT, Circuit Judges, and HINKLE,[*] District Judge.

GRANT, Circuit Judge:

Tupperware is accused of materially misrepresenting its financial performance in violation of § 10(b) of the Securities Exchange Act and Rule 10b-5. In a typical securities lawsuit targeting a corporation, the plaintiffs will seek to hold the company liable by alleging that the maker of a false or misleading statement herself acted with the required state of mind. But here no one argues that those who made Tupperware's allegedly false or misleading statements intended to defraud investors or recklessly disregarded the risk that the statements may be false. Instead, the complaint alleges that a fraudulent sales scheme occurred at one of Tupperware's foreign subsidiaries and asks that we hold the

_____

[*] The Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

company liable based on the lower-level corporate officials who knew of or orchestrated the fraud.

To do so, the lower-level corporate officials must have been "responsible for" the alleged misstatements. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008). This occurs when the official orders or approves the false statement or furnishes false information or language for inclusion in the statement. *Id.* The lower-level corporate officials that the shareholders point to may have known about the fraud—or even orchestrated the fraud themselves—but the complaint failed to directly connect them to the alleged misstatements. Accordingly, we affirm the dismissal of the misrepresentation claims against Tupperware for failure to adequately plead scienter.

The shareholders also claim to have brought a scheme liability claim against Tupperware and Luciano Garcia Rangel, Tupperware's Group President for Latin America during the class period. We affirm the dismissal of that claim as a shotgun pleading. We also therefore affirm the dismissal of the control person liability claim, which is derivative of an allegation of a primary violation.

I.

Tupperware is headquartered in Orlando, Florida and its securities are publicly traded on the New York Stock Exchange. Everyone (or at least everyone of a certain age) remembers "Tupperware parties." These parties were hosted in the homes of Tupperware's independent sellers, who would invite friends over for games, food, chats, and, of course, to sell Tupperware's food

storage containers—a new product that was not yet a household staple. *See* Erin Blakemore, *Tupperware Parties: Suburban Women's Plastic Path to Empowerment*, History Channel (Mar. 1, 2019), https://www.history.com/news/tupperware-parties-brownie-wise [https://perma.cc/3C9U-B5Y2]. But the company is not limited to food storage—it operates as a direct-to-consumer marketer of various products across a range of sectors including skin and hair products, cosmetics, toiletries, jewelry, and nutritional products.

Most relevant here, Tupperware acquired Fuller Cosmetics in 2005. Fuller's sales were primarily in Mexico, and its model was patterned on the same direct-to-consumer approach that made Tupperware successful. Specifically, Fuller used a network of independent salespersons—it called them the "Fullerettes"—to sell its cosmetic and fragrance products.

Fuller's numbers, however, did not mirror Tupperware's early successes. After years of declining sales, Tupperware announced that it was partially impairing Fuller's goodwill value. It also warned of a "high risk of future impairment to the remaining goodwill balance" if Fuller's operating performance continued to fall below expectations.

The shareholders allege that Tupperware named Luciano Garcia Rangel as its Group President for Latin America and Evaristo Hernandez as Fuller's Managing Director to avoid this fate. Accepting the complaint's allegations as true, Garcia Rangel and Hernandez—with the knowledge and support of Keith

Haggerty, Tupperware's Vice President of Operations for the Americas—orchestrated a scheme to boost Fuller's recorded revenue. The scheme allegedly took advantage of Fuller's sales model, with Fuller shipping extra (often high-value) products to the Fullerettes—products that exceeded the amount that they had ordered. Because the Fullerettes paid Fuller directly for the products (which they could then resell), Fuller increased its accounts receivable in the amount the Fullerettes would have owed the company had they in fact ordered the products. Fuller's management knew that these products would, in many cases, be returned—but Fuller recognized the revenue as soon as the products shipped. The complaint alleges that to avoid excess inventory from building up when the products were eventually returned, Fuller's management overrode the system that automatically replenished Fuller's stock when enough products shipped.

According to the complaint, these fake sales accounted for up to 60% of Fuller's recorded revenues during the class period. These inflated figures allowed Tupperware to avoid further impairment to Fuller's goodwill value, which led to overstatements in Tupperware's operating income, net income, and earnings per share.

The complaint alleges a series of public misrepresentations in Tupperware's quarterly and annual reports, press releases, earnings calls, and other filings with the Securities and Exchange Commission. For the year ending December 29, 2018, for example,

the complaint alleges that Tupperware's trademarks and tradenames were overstated by 97%, its goodwill by 29%, its operating income by 16%, and its net income and diluted earnings per share by 38%. In its quarterly report for the first quarter of 2018, Tupperware reported a "meaningful increase" in Fuller's sales, which it attributed to "enhanced merchandising and product propositions" and "more efficient promotional spending." The complaint alleges that these explanations about Fuller's increase in sales were materially false.

Eventually, the scheme fell apart. When it did, Tupperware was forced to impair Fuller's goodwill value and its stock price fell 35%. A few months later, an impairment of Fuller's tradename led to another decline in stock price, this time 45%. And in August 2021, Tupperware disclosed that the SEC was investigating.[1] It also corrected various misstatements in its previous reporting that it admitted "result[ed] from the override of certain controls by management at the Company's Tupperware Mexico operations and from the misconduct of Fuller Mexico employees."

Following the declines in Tupperware's stock price, several class action lawsuits were filed; they were eventually consolidated,

---

[1] Tupperware agreed to a settlement order with the Commission for violations of §§ 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act, related to recordkeeping and internal controls. *SEC Charges Tupperware Brands Corporation for Internal Controls and Books and Records Failures*, U.S. Sec. & Exch. Comm'n (Sept. 30, 2022), https://www.sec.gov/enforce/34-95943-s [https://perma.cc/64YY-8XZ7]. Neither the Commission's order nor its findings are included in the Complaint, which was filed before the settlement.

with Srikalahasti Vagvala named as the lead class plaintiff. The operative complaint brings securities fraud claims against Tupperware and Garcia Rangel (the former Group President for Latin America) under § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The claims against Tupperware are based on allegedly false or misleading statements made by Tupperware's Chief Executive Officer or Chief Financial Officer. E.V. "Rick" Goings and Patricia A. Stitzel both served as Chief Executive Officer at different times during the class period. Michael Poteshman and Cassandra Harris also served, at different times during the class period, as Tupperware's Chief Financial Officer.

Specifically, Count I alleges misrepresentation claims under Rule 10b-5(b) against Tupperware and scheme liability claims under Rule 10b-5(a) and (c) against Tupperware and Garcia Rangel. Derivative of those claims against Tupperware, the complaint also brings a control person liability claim against Stitzel and Goings (former CEOs), Poteshman and Harris (former CFOs), and Garcia Rangel under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). The class is defined as all persons or entities purchasing or acquiring Tupperware's publicly traded stock from January 31, 2018 through February 24, 2020.

After granting multiple opportunities to amend, the district court dismissed the shareholders' third amended complaint with prejudice. The misrepresentation claims against Tupperware failed to adequately allege corporate scienter. The scheme liability

claims failed to allege a scheme aimed at deceiving or defrauding investors. And without a primarily violation, the control person liability claim necessarily failed.

The shareholders now appeal the district court's order dismissing the complaint, and we affirm.

## II.

We review a district court's order dismissing a securities class action complaint de novo. *Mizzaro*, 544 F.3d at 1236.

## III.

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to use or employ "any manipulative or deceptive device or contrivance" in violation of rules promulgated by the Securities and Exchange Commission. 15 U.S.C. § 78j(b). In turn, the SEC's Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To successfully plead a claim under these provisions, the plaintiffs must allege, among other things, that a material misrepresentation or omission was made with scienter— a wrongful state of mind. *Mizzaro*, 544 F.3d at 1236 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005)). In this Circuit, the required state of mind is an "intent to defraud or severe recklessness on the part of the defendant." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011) (quotation omitted).

Securities fraud claims are subject to the heightened pleading standards of the Private Securities Litigation Reform Act of 1995. The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). To assess whether the complaint satisfies this high standard, we ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Mizzaro*, 544 F.3d at 1239 (quotation omitted).

Because corporations do not have states of mind of their own, "the scienter of their agents must be imputed to them." *Id.* at 1254. In a securities fraud suit based on alleged misrepresentations, we start by looking "to the state of mind of the individual corporate official or officials who make or issue the statement." *Id.* (quotation omitted). But here the shareholders do not allege that those who made the statements acted with scienter—when Tupperware's CEOs and CFOs made the allegedly false statements concerning Fuller's sales they were not aware of the fraud nor reckless in failing to discover it.

We also look to the state of mind of any corporate officials who "order or approve" a statement "or its making or issuance, or who furnish information or language for inclusion therein, or the

like."  *Id.* (quotation omitted).  Put another way, we look to the corporate officials that are "responsible for" the false or misleading statement.  *Id.*

The shareholders urge us to adopt a broader (and novel) standard.  In their view, if a corporate official's fraudulent act is a proximate cause of a materially false or misleading statement, then that corporate official's scienter should be imputed to the corporation.  They contend that this is consistent with the plain meaning of *Mizzaro*'s "responsible for" standard because a corporate official is "responsible for" a misstatement when her fraudulent conduct proximately causes the falsity of the statement. *Id.*

The shareholders misread *Mizzaro*.  To start, "the language of an opinion is not always to be parsed as though we were dealing with language of a statute."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979).  But in any event, *Mizzaro* does not say, as the shareholders here suggest, that the corporate official must only be responsible for the statement's *falsity*.  *See Mizzaro*, 544 F.3d at 1254–55.  The complaint in *Mizzaro* failed to allege that any corporate official was aware of the alleged fraud and was "responsible for *issuing* the allegedly false public statements."  *Id.* (emphasis added).  The outcome would have been different under a proximate cause standard because the focus was on the issuing of the false or misleading statement, not the underlying fraudulent conduct.  Without a more direct connection to the statement itself, *Mizzaro* shows that it is insufficient that a lower-level corporate

official's misconduct proximately caused a statement to be false or misleading.

The shareholders also urge us to embrace part of the Sixth Circuit's standard—"[a]ny high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014). It is true that *Mizzaro* leaves the door open to actions that are "like" ordering or approving a statement before it is made or issued or "like" furnishing information or language for inclusion in a statement. *Mizzaro*, 544 F.3d at 1254. But looking to the state of mind of officials *after* the statement issued is not "like" either. *See id.* Expanding our standard in this way would thus also be inconsistent with *Mizzaro*.

In sum, to hold a corporation liable for securities fraud, we first look "to the state of mind of the individual corporate official or officials who make or issue the statement." *Id.* (quotation omitted). Failing that, we look to the state of mind of the corporate officials who "order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like." *Id.*

**IV.**

Applying that standard here, we conclude that the complaint against Tupperware fails to state a § 10b-5 misrepresentation claim because it does not adequately plead scienter.

The shareholders allege that three corporate officials acted with scienter imputable to Tupperware: Fuller's Managing Director, Evaristo Hernandez; the Group President of Latin America, Luciano Garcia Rangel; and the Vice President of Operations for the Americas, Keith Haggerty. In broad strokes, the complaint alleges that each of these officials were involved in, orchestrated, or knew of the scheme to artificially inflate Fuller's revenue. For purposes of this appeal, we assume—without deciding—that each of these officials acted with scienter. But we conclude that the complaint does not create the requisite connection between these corporate officials and the public statements—it does not allege that they ordered or approved the statements or their making or issuance, or that they furnished information or language for inclusion therein, or any other activity directly connected to the statements. *See Mizarro*, 544 F.3d at 1254.

Before examining the involvement level of each of these three officials in turn, we note the pleading standards applicable in this context. *First*, while there is no per se rule against the use of anonymous sources, the weight to be afforded to allegations based on statements proffered by confidential sources depends on their particularity. *Id.* at 1240. The complaint must "fully describe[] the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Id.* Accordingly, we can only credit the statements from confidential witnesses to the extent that the basis for each statement is explained.

*Second*, the Private Securities Litigation Reform Act requires that Tupperware's scienter be alleged "with respect to each act or omission alleged to violate" the chapter.  15 U.S.C. § 78u-4(b)(2)(A); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004).  Therefore, there must be allegations creating a strong inference of the required nexus with the corporate official with respect to *each* specific alleged misrepresentation.

*Third*, the Private Securities Litigation Reform Act also requires a plaintiff to "state with particularity" the facts giving rise to a strong inference of scienter.  15 U.S.C. § 78u-4(b)(2).  This means that "omissions and ambiguities count against inferring scienter" and that speculation and conclusory allegations will not be sufficient. *Tellabs*, 551 U.S. at 326; *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006); *see also Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015).

## A.

We start with the allegations relating to Evaristo Hernandez, Fuller's Managing Director.  In the complaint, the anonymous "Former Employee 1" states that "it would be unusual for any communications from Fuller to [Tupperware's Orlando headquarters] to occur without Hernandez's knowledge and approval."  Former Employee 1 was one of Fuller's Divisional Sales Directors.  He was in charge of seven geographic sales districts in Mexico and reported to the Regional Sales Director.  He was at the company from October 2018 through May 2019.  Former Employee 6, a Vice President for Human Resources, adds that

"Hernandez approved the sales figures before they could be furnished to corporate headquarters in Orlando."

The complaint also points to Tupperware's amended Annual Report for fiscal year 2020 as corroboration. The shareholders argue that this disclosure establishes that Hernandez "furnished" information for Tupperware to incorporate into its financial statements. In that disclosure, Tupperware revealed to its investors the existence of an SEC investigation regarding its operations in Mexico. Tupperware also stated that its financial reporting for 2019, 2020, and 2021 contained misstatements "resulting from the override of certain controls by management at the Company's Tupperware Mexico operations and from the misconduct of Fuller Mexico employees." Tupperware shared that it had "terminated the individuals involved in the override" in 2020, and the shareholders argue that this must mean Hernandez, who was removed from his position in November 2019 and terminated in January 2020.

These allegations are insufficient to lead to a strong inference that Hernandez was directly involved in Tupperware's public statements. At the outset, we note that the complaint lacks direct evidence. For example, there are no emails or certifications from Hernandez that show his involvement with Tupperware's public financial reporting. Nor can we consider the statements provided by the anonymous former employees as direct evidence. To start, they suffer from a lack of particularity; the complaint does not explain the foundation for either former employee's statement.

It also lacks particularized facts showing why a divisional sales director (Former Employee 1) or a Vice President for Human Resources (Former Employee 6) would be familiar with Fuller's financial reporting.  In other words, the complaint does not establish a "proximity to the offending conduct" for either confidential witness.  *Mizarro*, 544 F.3d at 1240.  A divisional sales director is a relatively low-level employee without exposure to the company's financial reporting.  The complaint alleges only that this employee was "in charge of" multiple geographic sales districts, with multiple levels of supervisors above him.  Meanwhile, the complaint does not explain the basis for Former Employee 6's conclusion that Hernandez approved the sales figures for inclusion in the company's SEC filings or other public statements.

To be sure, evidence of the "smoking-gun" genre is not necessary to create a strong inference of scienter.  *Id.* at 1249 (quoting *Tellabs*, 551 U.S. at 324).  As circumstantial evidence, one could argue that Hernandez's title as Managing Director of Fuller leads to the inference that he approved its financial results and furnished information for inclusion in Tupperware's public statements.  But without more information about Tupperware's process for preparing its public financial statements, that conclusion would be speculative—which is not enough in the context of fraud.

Tupperware's disclosure adds little to the inference that Hernandez was responsible for Tupperware's statements.  Again, the issue here is not whether Hernandez knew of or orchestrated

the fraud at Fuller—what matters is whether he was directly connected to Tupperware's financial reporting. So even if we assume that Tupperware's disclosure does refer to Hernandez, engaging in fraudulent conduct is not the same as being responsible for public statements with material misrepresentations or omissions about that fraudulent conduct. As the district court put it, Tupperware's disclosure establishes only that "some employees engaged in misconduct, those employees were terminated, and due to that misconduct, the false data ended up in the public disclosures." The disclosure may confirm the source of the false data but it does not explain how the false data was transmitted from Fuller to Tupperware's consolidated financial reporting. It does not connect Hernandez's alleged fraudulent misconduct with Tupperware's public reporting. And with no further allegations connecting Hernandez to Tupperware's financial reporting, the complaint fails to create a strong inference that would allow for Hernandez's scienter to be imputed to the corporation.

What's more, even if the complaint had generally pleaded Hernandez's approval of Fuller's financials, it failed to do so "with respect to each act or omission alleged to violate" the chapter. 15 U.S.C. § 78u-4(b)(2)(A). For example, the shareholders allege that Tupperware's April 2018 earnings call suggestion that Fuller's sales improved due to "rebranding, [and] updating the merchandising and the product proposition to add energy to every campaign and boost the sales force morale" was misleading because the improved sales were in fact due to the fake sales scheme. But there are no allegations that connect Hernandez's approval of sales figures or

communications generally to the alleged misrepresentations made in that call.  Nor do any allegations connect Hernandez to the preparation of the CEO's statements to investors stating the reasons for Fuller's increased sales.  Did Hernandez explain to the CEO, or someone else, why sales at Fuller had improved?  We do not know—and there are no facts alleged in the complaint from which we can infer that he did.

The shareholders resist this conclusion by relying heavily on *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc.*, 564 F. Supp. 3d 1272 (N.D. Ga. 2021).  But that decision does not help the shareholders; in fact, it illustrates the sorts of allegations missing from their complaint.  In *Mohawk*, the plaintiffs alleged, based on statements from executive employees directly involved, that the flooring division president—whose scienter was imputed to the corporation—"furnished, approved and personally certified each quarter the purported accuracy of the information contained within the financial reports."  *Id.* at 1303 (quotation omitted).  And this information "was provided to investors during quarterly conference calls and incorporated in Mohawk's consolidated financial statements and SEC filings."  *Id.* (quotation omitted and alteration adopted).  This is the type of allegation that is missing from the shareholders' complaint against Tupperware—particularized facts from sources with first-hand knowledge showing that Hernandez directly furnished information for, approved of, or certified public financial reporting.

In sum, the complaint needed to allege that Hernandez had a direct role in each alleged public misstatement by, as relevant here, approving the statement or furnishing information to be included. Because the facts alleged in the complaint fail to create a strong inference that he did, we cannot impute Hernandez's scienter to Tupperware.

## B.

The shareholders next point to Garcia Rangel, who was Tupperware's Group President of Latin America during the class period. To support Garcia Rangel's scienter, the complaint relies on an anonymous former financial analyst in Tupperware's USA & Canada division (not the Latin America division), who retired in May 2018, four months into the class period. This employee, identified as Former Employee 7, says that in the USA & Canada division the Group President would review and approve the quarterly financial results before furnishing them to Tupperware. And indeed, when Garcia Rangel was the Group President of the USA & Canada division from 2010 to 2012, Former Employee 7 says that Garcia Rangel approved its financial reporting. The complaint extrapolates from these facts to conclude that when Garcia Rangel was the Group President of the Latin America division, he would have reviewed and approved Fuller's financial statements before they were incorporated into Tupperware's consolidated financial reporting.

We can credit the facts alleged by Former Employee 7 as they relate to the USA & Canada division, but we cannot do the

same for the Latin America division.  Former Employee 7 worked in a different division, largely during a different time frame, and does not claim to have any personal knowledge or connection to the preparation of Fuller's financial results.  He lacks any proximity to the offending conduct.  Even his interactions with Garcia Rangel—which are not described—would have occurred years before the alleged misstatements.  The complaint has not provided a detailed enough explanation of the basis for Former Employee 7's knowledge with respect to the Latin America division and Garcia Rangel's conduct there.

This lack of particularized facts connecting the practices and procedures of the USA & Canada division with the Latin America division is fatal to a finding of a strong inference of scienter.  All we can do is speculate, based on Former Employee 7's statements, that the procedures across the two divisions were the same and that Garcia Rangel would have approved—and did in fact approve—Fuller's financials.  This is particularly so when the complaint itself even concedes that in some respects the divisions operate differently.

And as with Hernandez, even if Former Employee 7's statements were sufficient to conclude that Garcia Rangel's responsibilities generally included reviewing and approving financial statements, there are no allegations tying Garcia Rangel to each of the specific misrepresentations alleged in the complaint.

In a last-ditch effort, the shareholders argue that Garcia Rangel "commanded" Fuller employees to continue the fraudulent

sales scheme at an alleged town hall.  But commanding the continuation of a fraud is not the same as commanding a false or misleading public statement.  Again, because we have assumed Garcia Rangel's scienter, we are focused on his connection to the alleged misstatements, *not* his connection to the underlying scheme.  We conclude that Garcia Rangel's scienter cannot be imputed to Tupperware.

## C.

Finally, the shareholders point to Keith Haggerty, the Vice President of Operations for the Americas, who reported directly to Tupperware's Executive Vice President of Product Innovation and Supply Chain.  But the only allegation regarding Haggerty is a statement from Former Employee 6—the Fuller Vice President for Human Resources—that Haggerty "visited Fuller quarterly to review its operations and financial results."  The complaint neither explains the basis for the former employee's conclusion nor describes with any particularity what Haggerty did to review Fuller's operations and financial results or what he did with the information he gathered.  Accordingly, we cannot impute Haggerty's scienter to Tupperware.

The shareholders do not point to anyone else whose scienter could potentially be imputed to the corporation.  Accordingly, the complaint does not allege facts leading to a strong inference of

22-10658                Opinion of the Court                21

scienter with respect to Tupperware, and we affirm the district court's order dismissing the misrepresentation claims.[2]

## V.

The shareholders also argue that the complaint asserts so-called "scheme liability" claims against Garcia Rangel and Tupperware under Rule 10b-5(a) and (c).  Whereas subsection (b) of Rule 10b-5 prohibits the making of untrue statements or omissions, subsections (a) and (c) prohibit deceptive conduct.  17 C.F.R. § 240.10b-5.  Subsection (a) makes it unlawful to "employ any device, scheme, or artifice to defraud."  *Id.* § 240.10b-5(a). Subsection (c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  *Id.* § 240.10b-5(c).  Both subsections maintain the requirement of being "in connection with the purchase or sale of any security." *Id.* § 240.10b-5.

The district court dismissed the third amended complaint's scheme liability claim because it failed to allege that Garcia Rangel, Hernandez, or Tupperware engaged in a "scheme aimed at deceiving or defrauding investors."  In our view, the problem with the complaint's scheme liability claim is more fundamental—it was improperly pleaded.

A complaint that "commits the sin of not separating into a different count each cause of action or claim for relief" is a shotgun

---

[2] The shareholders conceded at oral argument that Garcia Rangel is not alleged to have made a material misrepresentation or omission.

pleading. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). The class shareholders' third amended complaint brings two different claims—one misrepresentation claim and one scheme liability claim—in the same count. That makes it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996). The reader is required to discern for herself which allegations and facts in the complaint apply to the class shareholders' misrepresentation claim and which apply to the scheme liability claim. *See Cesnik v. Edgewood Baptist Church*, 88 F.3d 902, 905 (11th Cir. 1996). Moreover, that count brings claims against both Garcia Rangel and Tupperware without a clear indication of which claim applies to which defendant.

We therefore affirm the dismissal of the class shareholders' scheme liability claim on the ground that it is an impermissible shotgun pleading. The class shareholders have had multiple opportunities to amend their complaint. Due to its shotgun nature, when the defendants moved to dismiss the first amended complaint, they did not raise arguments concerning scheme liability. The district court excused this because it was an "unexpected issue[]" raised "for the first time by the opposing party's response." But that also put the class shareholders on notice of the pleading deficiency, which they have never corrected. *Cf. Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018). Because the class shareholders have had their "one chance to replead before dismissing a complaint with prejudice on shotgun-

pleading grounds," we affirm the dismissal with prejudice. *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 732 (11th Cir. 2020).

## VI.

We also affirm the dismissal of the § 20(a) claim against Goings, Stitzel, Poteshman, Harris, and Garcia Rangel for control person liability. A § 20(a) claim imposes liability "not only on the person who actually commits a securities law violation, but also on an entity or individual that controls the violator." *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 721 (11th Cir. 2008). But a "primary violation of the securities law is an essential element of a § 20(a) derivative claim." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010). Because the complaint does not successfully allege a primary violation of the securities laws, we affirm the district court's order.

\*      \*      \*

Our sister circuit has warned that if "the scienter of any agent can be imputed to the corporation, then it is possible that a company could be liable for a statement made regarding a product so long as a low-level employee, perhaps in another country, knew something to the contrary." *In re Omnicare*, 769 F.3d at 475–76. Yet that is exactly what the class shareholders ask of us here. Because lower-level employees, in another country, knew of a fraudulent sales scheme, they ask that we impute their scienter to Tupperware. Doing so would be inconsistent with our precedent,

24                          Opinion of the Court                    22-10658

so the district court's order dismissing the class shareholder's third amended complaint is **AFFIRMED**.

22-10658                    HINKLE, J., Concurring                    1

HINKLE, District Judge, Concurring:

I concur in the result and all the majority opinion except the shotgun-pleading discussion. That discussion relates only to the so-called scheme-liability claim. I agree with the district court that, as a matter of substance, the third amended complaint fails to state a scheme-liability claim on which relief can be granted. This would be true even if the same facts were set out in a separate count and in a form that could not be characterized as a shotgun pleading. I would affirm the dismissal of the scheme-liability claim on this basis.